So the next case on our docket this morning is Sasser v. Salt Lake City Corporation. And I think the panel is ready, as counsel is, and so we'll hear from appellant's counsel. May it please the court. Lauren Skolnick of the firm of Strindberg and Skolnick for appellant Quentin Sasser. In dismissing Mr. Sasser's race discrimination case for failure to promote him to a full-time assistant golf professional position at Salt Lake City's golf division, the district court erred in three ways when it discounted Mr. Sasser's evidence of pretext. It discounted evidence that demonstrated that the deciding official, golf director David Terry's reasons for not promoting Sasser were unworthy of belief. It discounted Lynn Langren's prior treatment as the supervisor of Mr. Sasser and how that prior treatment was connected to David Terry's decision not to promote Sasser. And it discounted how Terry's use of both subjective criteria and procedural irregularity provided room for race discrimination. The district court discounted evidence that demonstrated that golf director Terry's reasons for not promoting Sasser were unworthy of belief. Mr. Terry claimed that he did not pick Mr. Sasser for the full-time assistant professional position because he wasn't spending substantial time in a golf pro shop at the time of the hiring. However, Mr. Terry listed another applicant, fifth on his list when he ranked from one to ten, those people who should be interviewed, an applicant that wasn't even working in a golf course, let alone a pro shop. That applicant that he chose and listed as number five was working at a retail pro sporting goods store. Additionally, Mr. Terry directed the panel members who were helping him find the interviewees, he told them to use the job description for the position, the assistant professional position. That job description said that there was a qualification for the position of two years' experience in golf operations or maintenance. However, Mr. Sasser had over nine years of experience, and yet Mr. Terry did not choose him. Can I ask you a question that is just all over this case and it's latent. There are four in this case, assuming that Mr. Landgren or Mr. Terry didn't contaminate, essentially or taint the decision-making of Mr. Brimley or Mr. Schmell, there are four independent decision-makers, each had 25% of their ranking that would go into the decision of which eight or nine individuals to interview. And that's where he lost out. So I searched in vain for a case that deals with the scenario where you have, there are lots of committee decisions where there's a consensus, but here there wasn't a consensus. Each individual individually voted. What do we do with the fact that Mr. Brimley and Mr. Schmell had collectively 50% of the vote and there's really no consensus? What do we do with Mr. Terry and Mr. Landgren? Admittedly, the Landgren case is the clearest, and we can talk about Mr. Terry, but if you would like to set him aside for the moment, we can. Let's look at just Mr. Brimley's decision. And what we have with Brimley is a misapplication of what was clear from even Mr. Sasser's application and the fact that he denigrated those credentials while elevating those of Mr. Miller. For example, in Mr. Brimley, Mr. Brimley reviewed the application materials, and in those application materials it stated that he was having tournament experience. Mr. Brimley admitted that this was important to him in making the decision. He ignored the fact that Mr. Sasser had this tournament experience, but he credited Miller, and there's no resume for Miller in the record, but he credited Miller for what he thought he understood about what Miller's tournament experience was, even though there's no proof of it. So now we have that issue that goes to pretext of elevating one candidate's application materials and qualifications and denigrating Mr. Sasser's. Additionally, with Mr. Brimley, he thought, he testified that he thought Mr. Sasser had a reputation of being abrupt. Bear in mind that Mr. Brimley never worked with Mr. Sasser. He ignores, but admits that he knew that Miller took a negative tone with customers. So again, this type of disparate treatment of the credentials, the same credential, could show the pretext of Mr. Brimley himself, separate and apart from whether or not there is taint. Then when we go to Mr. Schmell, who is the fourth and the youngest member of the panel, the newest head pro in the city system that was on this panel, Mr. Terry is the cause here for what Mr. Schmell did. Mr. Schmell was told by Terry, and he was the only pro who was told this, don't look at anything but the written materials. Do not consider what you know about the candidates, except for what's in writing. Mr. Schmell admits that he would have interviewed Mr. Sasser. It would have put him on the list to be interviewed if he was allowed to consider what he knew about Mr. Sasser. And what he knew about Mr. Sasser was that he was an excellent junior golf professional and teacher. He had won a junior golf professional statewide award, and he was actually Mr. Schmell's kid's instructor. And had he been able to consider all he knew about Mr. Sasser, he said he definitely would not have been interviewed. So I don't think you can consider Mr. Schmell apart from the influence that Mr. Terry had on him when he told him that he had to consider only what was in writing about Mr. Sasser. So when we go back to Mr. Terry, not only was he not consistent in what the job description said when he was interviewed, but he contradicted what he wrote to the head pros. In the recruitment for this position, he sent an email out, Mr. Terry did, saying that he wanted to let the head pros know that any of their seasonal employees should apply for this position. Not seasonal employees who are currently employed in the pro shop, but any seasonal employee. Additionally, we have the problem with Mr. Terry with the resume upload. So the system, the online system that Salt Lake City was using for applicants, had a glitch. And several of the applicants' resumes did not upload to the system. Mr. Terry reached out, there were of those that didn't upload, three city employees' resumes didn't upload. Two of those were white, and one of them was Mr. Sasser, who was black. Mr. Terry reached out to the two white city employees and said, bring in your resumes, they didn't upload. He did not call Mr. Sasser. He did not tell Mr. Sasser to bring in his resume. This, again, impacts on Mr. Schmell's assessment of Mr. Sasser, because remember, Schmell's told, only review these candidates based on what's in writing. And when Mr. Terry doesn't say to Sasser, bring in your resume, Schmell never received Mr. Sasser's resume. So not only couldn't he consider what he knew, Mr. Sasser was treated differently than his white co-applicants and city employees, and he was then out of the running as far as Mr. Schmell was concerned, even though Schmell would have wanted to interview him. And when you were saying that, I noted how carefully you said that, that they were Caucasian and they were current employees. Now, your adversary has said that under our precedence, that a procedural irregularity is pertinent to pretext under McDonnell-Douglas only if the irregularity has a substantially unique impact on the pretext. On the plaintiff. And so you are defining the universe of people as being those three, the two Caucasian current employees, but, of course, there were two Caucasian non-employees that were treated exactly like Mr. Sasser. And so how, you know, help us out. How do we say that it uniquely impacted him when all of a sudden, Mr. Sasser was treated like a Caucasian non-employee? How do we say that all four of you presumably agree that it really didn't uniquely impact him because it also impacted two Caucasian non-employees who were also vying for the position? And that goes to the issue of what Mr. Terry says is part of his legitimate non-discriminatory reason, that he was just concerned about folks who were presently working in pro-shops. But city employment, if the record is looked at as a whole, Mr. Terry actually believes that city employment matters. It matters if you're a city employee. When he touts, there's an email he sends out, and he touts the hiring of Jeremy Miller for this position, he talks about six of the nine interviewed were current city employees. He makes a very clear point to say that this was important. Other of the Mr. Landgren both say that city employment is important. So that is a question I think for the jury as to how important it is, and whether that was a differentiating factor. But when we look at it here, I think that there's enough to send it to a jury on that question of whether or not city employment was an actual factor that mattered. And if it was, he was looking specifically at city employees, Mr. Terry was. And so you can't just say, oh, these two other people whose resumes didn't upload. And by the way, if you look at their application materials for the two non-city employees, it has no information whatsoever. It doesn't say whether they were working even in golf at that time. So there was no way to make that determination. But Mr. Terry knew that Sasser had worked in golf pro-shop for Salt Lake City for years, didn't happen to be doing it at the time, but only reached out to his white coworkers to bring in his resume. Was it just bad luck on the glitch? The glitch is legitimate? There's no evidence to suggest that it's not legitimate. Okay. And could the three applicants whose resumes did not upload, could they tell that? Or they had no idea that that happened? There's nothing in the record that indicates that they had gotten anything in response. I'd like to reserve the rest of my time for rebuttal. Thank you. May it please the Court, Counsel Jonathan Papasiteris along with Allison Parks from the Salt Lake City Attorney's Office representing the appellee in this case, Salt Lake City Corporation. Your Honors, this appeal presents a single issue, and that is, did the district court correctly conclude that Mr. Sasser failed to adduce evidence of pretext sufficient to withstand the City's motion for summary judgment? Here, Mr. Sasser advances numerous theories of pretext. In an attempt to organize these and present them efficiently, we believe that they essentially fall into four separate boxes. The first box is Mr. Sasser alleges that the hiring process at issue here improperly relied on subjective criteria akin to that in the case of Garrett versus Hewlett Packard. The second box, and I'll address this one actually first in my discussion because Ms. Skolnick addressed it, is he alleges that a single procedural irregularity involving the transmission of resumes is another factor that provides indicia of pretext. Third, he asserts that he was the most qualified candidate for the position in question. And fourth, he speculates and conjectures that Lynn Landgren somehow infected, for lack of a better word, the entire hiring process based on the fact that Mr. Landgren documented certain instances involving Mr. Sasser for a four-year period. Let me start with the issue that Ms. Skolnick took up first, which is the procedural irregularities question with regard to the pretext inquiry. Now, it is true that the court must consider the totality of the circumstances when evaluating pretext. That is axiomatic under this court's case law. But in evaluating pretext, it is likewise axiomatic that the court is required to examine the facts as they appeared to the person making the challenged employment decision. In other words, the court needs to look at what information the decision-makers at the time had in front of them. Second, the court needs to assess whether the employer believed its proffered legitimate, non-discriminatory reasons and acted in good faith upon those beliefs. The question is, did the employer honestly believe it? Similar, this court doesn't ask whether the employer's decision was wise or fair or correct, or that it might have been wrong. Or that it might have been mistaken or might not have been the proper exercise of business judgment. Rather, this court is examining whether sufficient indicia exist of intentional racial discrimination. That's what the pretext inquiry is. Are there enough inconsistencies, irregularities, things like that, that could give rise to a question in the minds of a reasonable juror as to whether the proffered legitimate discriminatory reasons were merely a mask for, in this case, race-based animus. And then, of course, the fourth critical component is that mere conjecture, speculation, assumption, and innuendo are not sufficient to overcome summary judgment. Now, let's first start with the procedural irregularity that's at issue in this case. And really, it's one procedural irregularity, and that is this issue with regard to the resumes. Judge Bacharach, to get to your question and to answer that, there is Mr. Terry's decision to not inquire on the basis of the individual's, the five individuals whose resumes failed to upload. That may not have been wise. That may not have been correct. That may not have been fair. But what it's missing is any indicia that it was based on a discriminatory reason. Well, let me probe that a little bit. Now, particularly on summary judgment, viewing the evidence in light most favorable to Mr. Sasser, why couldn't a reasonable fact finder say Mr. Terry knew that Mr. Sasser was African-American, and a current employee, obviously, he knew that, that the two Caucasian current employees, or that the two other employees who had the same glitch were Caucasian, and that he obviously thought fairly highly, to some degree, of Mr. Terry. He did rank him, I mean, Mr. Terry of Mr. Sasser, he ranked him 10th. And that's automatically considered, you know, beyond the realm of being a potential somebody to consider. There is evidence that Mr. Skolnick has pointed out in a brief and today, that Mr. Terry did value current employee status. He did want to promote, you know, from within. And so why couldn't a reasonable fact finder say, well, he didn't do it for Mr. Sasser because he was African-American, he did it for the other two because they were Caucasian, and if he had just told him the same thing, we didn't get your resume, because as you answered to Mr. Phillips, Mr. Sasser had no way of knowing that, as any of the five did, and that Mr. Schmell, had he known that, did testify, as Ms. Skolnick said, that he would have wanted to, definitely wanted to have interviewed him. So why couldn't, at least with regard to Mr. Schmell, somebody reasonably infer that the irregularity that Mr. Terry committed didn't taint the decision-making of Mr. Schmell? Sure, let me unpack that a bit. Let's first talk about the issue of the importance of city seniority to the position. Now, Mr. Terry testified that in the list of factors that he deemed were most important as the Director of Golf, city seniority was near the bottom, and if you examine the record, that's very clear. Mr. Terry did say that what was important was if the individual had been serving in a position that was a stepping-stone position to the next one, and there's no dispute that Mr. Davis and Mr. Miller had both been serving in that stepping-stone position for the past few years prior to this job posting becoming open. So it's not, it mischaracterizes the record to say that Mr. Terry said that city seniority in any position, or no matter how remote, was relevant. He never said that. In fact, he specifically emphasized the importance of the duties of the current position translating into the responsibilities and the duties of the position that was being sought. With respect to whether a reasonable jury could conclude, whether this could go to a reasonable jury, I think there could be circumstances here, but they're not present in this case that would warrant this factor possibly going to a jury. For example, if Mr. Terry had contacted all of the non-African-American applicants whose resumes did not upload to contact them and say, hey, for whatever reason, your resume didn't upload, that would be pretty strong indicia that something was a bit irregular there. Why would you contact all of the white or non-African-American applicants and not contact the lone non-African-American applicant? Similarly, had Mr. Sasser been serving, like Mr. Davis and Mr. Miller, in a position currently for the past few years that had been a stepping-stone position, and had Mr. Terry not contacted him, again, that would be stronger evidence of pretext, because it would beg the question, if the criteria that you're most concerned about is individual's experience in the stepping-stone position, and you know Mr. Sasser is in the stepping-stone position, and the only difference between he, Mr. Davis, and Mr. Miller is his race, that would be much stronger indicia of pretext, Your Honor. But we don't have any of that here. And when you look at the case law on procedural irregularities in this circuit, this case is dramatically different from the cases cited by plaintiffs. For example, the plaintiff cites the Mohammed v. Callaway case from 1983. That is a vastly different case. There's no dispute here that every individual, including Mr. Miller, met the minimum qualifications for the position. The city doesn't dispute that Mr. Sasser met the minimum qualifications for the position. In Mohammed v. Callaway, the minimum qualification for the position was a bachelor's degree in engineering. The candidate who the decision-maker selected didn't even have the minimum qualification. So when you compared that, that was a procedural irregularity. There's also evidence of procedural irregularity where there's proof that the hiring manager can manipulate the criteria. How about that on Stepping Stone? Was Stepping Stone part of the job description? Was that posted? No, but if you look at the duties, if you look very closely at the duties and the description of the job, it is very clear, and this is very similar to Conroy, Your Honor, it's very clear that the majority of the duties involve work in the pro shop. In fact, Mr. Terry testified, as the director of golf, that in evaluating applicants for assistant pro positions, the city placed special emphasis on essentially four areas, providing quality customer service, merchandising and handling pro shop inventory, operating point of sale, and running group golf events. As he summarized it, it's running a boutique business in a golf shop. In that recitation, was there any, I noticed you didn't say current, and that's exactly your adversary's argument, that he had plenty of pro shop inventory. It is undisputed that Mr. Sasser had no, even viewing the facts as this court must, in the light most favorable to Mr. Sasser on summary judgment, it is undisputed Mr. Sasser had no pro shop experience post 2002. That's an undisputed fact. And neither did the applicant that got the position. Incorrect, Your Honor. Mr. Miller had been serving as, in a pro shop, in a city pro shop, for five years prior to Mr. Sasser's tenure, to when he got the position. Mr. Miller served from, I believe it was 2006. I thought he had been working in a golf shop. No, no, he was, the record reflects, he was working at city golf courses. No, that's Mr. Pettengill, Your Honor. Let me address Mr. Pettengill. Sorry. If you look at Mr. Pettengill's resume, it is true that from 2008 to 2011, Mr. Pettengill had been the assistant manager at a sporting goods store. Now, that actually ties to one of the things the city focused on, which was merchandising and handling pro shop inventory. That's significant relevant experience, but it doesn't stop there. If you look at Mr. Pettengill's resume, you will see that from 2002 to 2008, so prior to accepting his employment at the sporting goods store, he was a consistent assistant golf professional at two other courses outside the city, including a stint during that time as the acting head professional at a course. So it's simply inaccurate to say, as Mr. Sasser tries to posit, that Mr. Pettengill was simply a retail person. The reality is, from 2002 to 2008, Mr. Pettengill was working as an assistant professional at two other golf courses. It is undisputed Mr. Sasser was not. Why does that matter? If he's worked in a golf shop or a golf, I'm not sure, at a golf course in the shop in years past, it's not like there's been revolutionary advances in the golf shop working business, are there? I mean, he knew how to do it. Well, that might be true, Your Honor. I don't think we can go that far. The record is silent as to whether or not significant changes happened, but obviously the passage of time from 2002 to 2011, many things in society changed, but there's no evidence in the record of that. But he was doing some other things that are also on the list. He was running tournaments in southern Utah. Well, let's look at that, Your Honor. If you look at, again, viewing the facts in the light most favorable to Mr. Sasser, if you really unpack what Mr. Sasser said he did as the tournament director at Coral Canyon, it essentially consists of three things. It consists of taking the reservation, collecting the deposit, and making the signs, the signs for the placards. He was not the assistant professional at Coral Canyon, despite what it says on his resume. There's no evidence to indicate that he was. In fact, I would note, if you actually look at Mr. Sasser's resume, which he claims was a critical factor in not getting promoted, and that's in the record at 353, he lists himself as having been an assistant professional at Wingpoint at the city. You have his job description. Mr. Sasser was never an assistant professional at Wingpoint at Salt Lake City. That he knew how to run tournaments is the point. He may have known how to run tournaments, Your Honor, again, viewing the facts in the light most favorable to him, but Mr. Brimley focused primarily on, he did mention tournaments. He was the only one who mentioned tournaments. Mr. Brimley primarily focused on the merchandising and the point of sale system. And if you look at Mr. Sasser's resume, there is nothing in here that indicates any of that. That's an assumption that the plaintiff has asked you to make. In fact, I would encourage the court to look at the resume at 353 and read the summary of experience. And what the summary of experience reveals, if you read it, is Mr. Sasser is emphasizing his abilities, frankly, his conceded outstanding abilities as a teacher. And it is undisputed that although that appears in the job description, that that was not the primary consideration here. Teaching ability was a factor, but it was not the primary factor. And if you look at the resume, it simply, it doesn't hold water. But isn't that going directly to the selectors manipulating what's important and what's not? All of a sudden, here you have this great golf teacher, that's not so important anymore. He's the only one who had his card, which was considered to be important at one point. Is that right? No, that's not true. Mr. Ballef was a class A PGA member, like Mr. Sasser. He was also Caucasian. Mr. Ballef did not appear on any of the ranker's lists. Miller did not have that, and he was credited with trying to get it. But that was all the minimum qualification required, Your Honor. The minimum qualification didn't require class A PGA membership. If it did, this is an entirely different case. This is much more similar to Mohamed. If the minimum qualification was, you must be a class A PGA professional, rather than have done what Mr. Miller and the other applicants did, passed an initial test and progressed toward membership, it's a different case. Then the class A PGA membership is possibly much more probative. But that's not the minimum qualification here. It just isn't. I see that my time is about to expire, Your Honors. If there's nothing further, thank you. Thank you very much. So just a few points on rebuttal, Your Honors. First of all, even if Mr. Langren's overt race discrimination and bias is removed from the situation, as we discussed when I was up the first time, and he was just one of four panelists, there's adequate reason and reasonable reasonable reason that we can put forward a case that would allow there to be pretext. The cases have said that disparate treatment is perhaps the most potent form of pretext that we can put forward. And here there's disparate treatment between the way Mr. Miller was considered in this promotion and the way Mr. Sasser was considered. Certainly the resume issue just isn't something that just screams at you. Mr. Miller, bring it in. Mr. Sasser, we don't need your resume. The other issue is that several of the panelists mentioned that they understood that Mr. Miller's tone with golfers, customer service, dealing with them in terms of the golf course, was perhaps negative or harsh in some way, or he had a problem with authority. But that was all taken with the grain of salt. On the other hand, Mr. Langren, of course, says that Mr. Sasser could be a little rough or hard, and that was credited with why he wasn't interviewed. Mr. Brimley heard that he had a reputation for being abrupt, and that was important to him. Most, perhaps most importantly, there's been, there was prior misconduct on Mr. Miller's part that Mr. Terry knew about, but choose to put aside. Specifically, Mr. Terry knew that Miller had been the source of a customer complaint because he was intoxicated at the golf course. And that was a recent piece of misconduct prior to this. 2005, 2010 is what Mr. Terry says. Miller had something no one else had, which is he had been working, essentially doing that job after the Nibley Pro left. Why is that not enough by itself? Because that's not exactly what the panelists said. What the panelists, oh, I see my time's up. Can I answer your question? Certainly. Okay. What the panelists said is, Mr. Terry said there were management functions that Jeremy was having to take on as a result of full-time employees potentially not doing basically their jobs. Mr. Brimley said because the head pro didn't like Nibley Golf Course for some unknown reason, Brimley just knew that Jeremy was an assistant not on salary. This was the hear tell about what happened. And Mr. Langren said he helped run Nibley for Mac, so the head pro. So it's not clear from the record that he actually took on any substantial assistant pro. And in fact, in the record, there's no increase in his salary. He's not made a full-time employee. There's no indication that he took on that temporary assignment in any substantial way. Thank you.